## 10979

### SANDEL v. STATE

### (119 S. E., 776)

1. States—Trial Judge Not Authorized to Find That State, in Furnishing Vaccine, Acted as "Eleemosynary Corporation."—In an action against the State for the death of plaintiff's child, alleged to have been caused by inoculating him with impure vaccine furnished by the State Board of Health, *held*, that the trial Judge would not have been warranted in finding, as an indisputable inference of fact, that the State's acts were those of an eleemosynary corporation, within the rule exempting such institutions from liability under the doctrine of *respondeat superior;* an "eleemosynary corporation" being a private corporation created for charitable and benevolent purposes, as distinguished from a public corporation.

---

Note: On liability of eleemosynary institution maintained by State or municipality for personal tort of agent or servant, see note in 4 L. R. A. (N. S.) 269.

On effect of statute permitting State to be sued upon the question of its liability for negligence or tort, see note in 13 A. L. R., 1276.

On contributory negligence of parent as bar to action by parent or administrator for death of child *non sui juis,* see notes in 18 L. R. A. (N. S.) 328 and 38 L. R. A. (N. S.) 754.

As to admissibility as *res gestæ* of statements made by agent or servant some time after the accident, see notes in 27 L. R. A. (N. S.) 435 and 42 L. R. A. (N. S.) 918.

2. APPEAL AND ERROR—APPELLANT MUST RELY ON GROUNDS ASSIGNED FOR NEW TRIAL AND DIRECT VERDICT IN CIRCUIT COURT.—Appellant must rely, in the Supreme Court, upon the grounds of motions for a new trial and for a directed verdict, assigned by counsel in the Circuit Court.

3. STATES—DEFENSE THAT STATE ACTED AS ELEEMOSYNARY CORPORATION NOT AVAILABLE, IN VIEW OF ENABLING ACT.—In an action against the State for the death of plaintiff's child, alleged to have been caused by inoculating him with impure vaccine furnished by the State Board of Health, even if the State acted as an eleemosynary corporation, it was not the intent of the Legislature that the State should claim immunity from liability on that ground, in view of the Enabling Act, authorizing an action under Civ. Code, 1912, §§ 3955–3958, and providing that the principles of law applicable to the case brought against any person or corporation shall be applicable.

4. APPEAL AND ERROR—IN ACTION AGAINST STATE, DECISION ON FIRST APPEAL HELD CONCLUSIVE AS TO WAIVER OF IMMUNITY AS SOVEREIGN. —Where, in an action against the State for wrongful death, the Supreme Court, on the first appeal, held that the complaint stated a good cause of action, a waiver of the State's immunity as a sovereign has been adjudicated, and that question is not open for further consideration.

5. STATES—WAIVER OF IMMUNITY AS SOVEREIGN HELD WAIVER OF IMMUNITY AS ELEEMOSYNARY CORPORATION.—A waiver of the State's immunity as a sovereign is also a waiver of its immunity as an eleemosynary corporation.

6. APPEAL AND ERROR—POINT PRESENTED AND DECIDED ON FIRST APPEAL LAW OF CASE.—In an action against the State for wrongful death, where the right of the State to rely on the defense of contributory negligence was squarely presented to, and decided by, the Supreme Court on the first appeal, that adjudication is the law of the case.

7. APPEAL AND ERROR—REMARKS OF SUPREME COURT IN REMANDING CASE FOR NEW TRIAL AS TO QUESTION NOT INVOLVED NOT BINDING.—Where on the first appeal a case was reversed and a new trial was granted, no binding force is to be attributed to the remarks of the Supreme Court on that appeal as to the weight and sufficiency of the evidence; that question being in no wise involved.

8. STATES—IN ACTION AGAINST STATE FOR DEATH CAUSED BY IMPURE VACCINE, EVIDENCE REQUIRED SUBMISSION OF ISSUE OF CONTRIBUTORY NEGLIGENCE TO JURY.—In an action against the State for the death of plaintiff's children, alleged to have been caused by inoculating them with impure vaccine furnished by the State Board of Health, evidence *held* to require submission of the issue of contributory negligence to the jury.

9. EVIDENCE—REPORT OF PHYSICIAN TO STATE BOARD OF HEALTH NOT ADMISSIBLE AS EXCEPTION TO HEARSAY RULE RELATING TO PUBLIC OR OFFICIAL RECORDS.—In an action against the State for the death of plaintiff's child, alleged to have been caused by inoculating him with impure vaccine, furnished by the State Board of Health, a report of a physician, employed by the State through the Secretary of the State Board of Health, made to that Secretary concerning an investigation as to the death of children following the administration of vaccine is hearsay, and, there being no official duty to make such report, it is not admissible under the exception to the hearsay rule relating to public or official records, especially since, under the Enabling Act, the State occupied the position of a person or private corporation liable for a wrongful death.

10. EVIDENCE—PRINCIPAL NOT BOUND BY AGENT'S DECLARATIONS, MADE LONG AFTER COMMISSION OF TORT.—Where an agent makes declarations or admissions concerning a tort so long afterwards that they cannot be admitted as part of the *res gestæ*, the principal is not bound by them.

Before RICE, J., Richland, June, 1921. Reversed and remanded.

Action by J. O'Neal Sandel as administrator of the Estate of Minnie Sandel against the State of South Carolina. From judgment for plaintiff the defendant appeals.

For the former appeal in this case see 115 S. C., 175.

*Messrs. Sam'l M. Wolfe, Attorney General* and *A. M. Lumpkin,* for appellant, cite: *The defense of contributory negligence was not eliminated by the former decision, and should have been submitted to the jury:* 109 S. C., 167; 56 S. C., 524; 107 S. E., 664; 71 S. C., 58; 91 S. C., 7; 63 S. C., 494; 99 S. C., 420; 64 S. C., 104; 101 S. C., 59; 94 U. S., 469. *Charge on facts:* 99 S. C.. 200; 99 S. C., 333; 100 S. C., 32. *Proof of theory by circumstantial evidence:* 66 S. C., 394; 1 Moore Facts 600; 90 N. W., 536; 154 N. Y., 90; 100 U. S., 693; 145 Fed., 273; 37 N. W., 182; 17 ·Fed. Cas. No. 9972; 43 So., 614. *Failure to prove negligence:* 115 S. C., 312; 55 S. C., 420; 9 Ann. Cas., 424; 98 S. C., 25. *Report of employee not authenticated is hearsay:* 22 N. E., 668; 22 C. J., 802; 153 Fed., 433; 112 N. E., 612. *Suit against State:* Const., 1895, Art., 17, Sec. 2; 8 L. R.

A., 399., 7 Lab. Master and Servant, 7661; 7 Con. S. C., 216; 8 Wall., 269; 7 Jur., 224; 6 Best & L., 257. *Consent to suit does not concede liability:* 26 Enc. L., 487; 36 Cyc., 915; 15 L. R. A., 700; 9 Wheat., 720; 15 L. Ed., 991; 109 S. C., 301.

*Messrs. Graydon & Graydon, Cole L. Blease, Colcock & Colcock* and *Colin S. Monteith,* for respondent, cite.: *Contributory negligence:* 67 S. C., 146; 59 S. C., 311; 7 Enc. L. (2nd Ed.), 371; 56 S. C., 91; 58 S. C., 222; 26 S. C., 400. *Circumstances establishing negligence:* 98 S. C., 348; 95 S. C., 347; 14 Rich., 237. *Report of Board of Health competent:* Green. 1 Evid. Sec. 483, 484. *Motion for nonsuit res adjudicata:* 106 S. C., 317; 23 S. C., 96; 107 S. E., 31; 65 S. C., 418; 93 S. C., —; 65 S. C., 410; 92 S. C., 354.

August 2, 1923.

The opinion of the Court was delivered by MR. JUSTICE MARION.

. The appeal arises in an action brought under the provisions of an Act entitled "An Act to authorize and empower the administrator or administrators of Thelma Sandel and Minnie Sandel, deceased, to bring action against the State of South Carolina." 30 St. at Large, p. 1097. The body of the Act authorizes the bringing of—"action in the Court of Common Pleas for Richland County against the State of South Carolina, for the recovery of such damages as may be proper, if any, on account of the death of the said Thelma Sandel and Minnie Sandel at Lone Star, South Carolina, in the year 1915, following the injection of serum furnished by the State of South Carolina."

And further provides as follows:

"The action or actions, shall be brought under the provisions of, and for the benefit of, the persons named in Sections 3955 to 3958, both inclusive, of Volume 1, Code of Laws of S. C., 1912, except that punitive damages shall

not be prayed for in the complaint, and the principle of law applicable to cases brought against any person or corporation, organized under the Laws of South Carolina, shall be applicable to the action or actions, hereby authorized to be brought. The action or actions shall be commenced by the service of a summons and complaint under the Code of Civil Procedure, and the same shall be served upon the Attorney General of the State, who is hereby directed to answer the same, and to protect the interest of the State, either side to have a right of appeal to the Supreme Court as in ordinary civil actions."

Under authority of this Act the plaintiff herein as administrator brought separate actions against the State for damages on account of the deaths of the two children, Thelma and Minnie Sandel, alleging in each case that death was caused by the injection of contaminated anti-typhoid vaccine furnished by the State and that such contamination was due to the negligence of the State, through its agents and servants, in the preparation and distribution of the vaccine. The State demurred to the complaint upon various grounds. The defense interposed by answer was a general denial and a plea of contributory negligence. The cases were first tried together before Judge T. S. Sease and a jury, March, 1920, and resulted in a verdict for the defendant. On appeal by plaintiff this Court passed upon several questions raised and granted a new trial for error in the Judge's charge (*Sandel v. State*, 115 S. C., 168; 104 S. E., 567; 13 A. L. R., 1268), following which this case, being the separate action for the death of Thelma Sandel, was tried the second time before Judge H. F. Rice and a jury, June, 1921, and resulted in a verdict for plaintiff in the sum of $25,250.

From judgment upon verdict the defendant appeals upon various grounds, raising substantially the following questions, which will be considered in the order stated: (1) Was there error in refusing defendant's motions for non-

suit and for the direction of verdict? (2) Was there error in withdrawing from the jury the defense of contributory negligence? (3) Was there error in admitting in evidence the report of Dr. F. A. Coward?

1. As to the first question, we think the motions for nonsuit and for the direction of verdict were properly refused. Discussion of this question is appropriately prefaced by that portion of the Act itself which provides that summons and complaint in the action authorized shall be served upon the Attorney General—

"who is hereby directed to answer the same, and to protect the interest of the State, either side to have a right of appeal to the Supreme Court as in ordinary civil actions."

Under the well-settled rule, the defendant must rely in this Court upon the grounds of the motions as specified and assigned by counsel upon Circuit.

The grounds upon which these motions were actually made on the trial below were (1) that there was no evidence of any negligence which operated as a proximate cause of the death—a contention clearly directed to an issue of fact, and (2) that there was no liability under the Act, in that the evidence established that in the commission of the alleged delict the State was acting in the capacity of an eleemosynary institution. The evidence upon the issue of fact as to negligence was such as to require the submission of that issue to the jury. The contention that in the distribution of vaccine the State occupied the position of an eleemosynary institution and was not on that account liable, either at common law or under the terms of the Act, is likewise untenable. To have granted defendant's motions on the latter ground would have involved (1) a finding that the evidence was open to no other reasonable inference of fact than that the vaccine was furnished by the State in the capacity of an eleemosynary institution, and (2) that the State, in conferring authority to bring action, had reserved the right to disavow liability for damages upon the ground

that, as an eleemosynary corporation, it was not liable for the torts of its agents and servants.

As to the first proposition, we do not think it would have been competent for the trial Judge to hold that, under the evidence adduced, the State's Acts and conduct were in fact those of an eleemosynary corporation within the rule exempting such institutions from liability under the doctrine of *respondeat superior.* Eleemosynary corporations are those created for charitable and benevolent purposes. "An eleemosynary corporation is a private as distinguished from a public corporation." 7 R. C. L.——; *Am. Asylum, etc. v. Phoenix Bank,* 4 Conn., 172; 10 Am. Dec. 112. To find as a fact that in the distribution of typhoid vaccine the State, through the State Board of Health, was engaged purely in a work of charity and benevolence would have required the Court to assume that there was no economic and utilitarian purpose in the undertaking to safeguard and promote the health of the members of the body politic by distributing the vaccine in question. As a matter of fact there are substantial differences in character and purpose between the work of the ordinary private corporation engaged in administering a fund for purposes of charity and benevolence, that is, of a so-called eleemosynary corporation, and that of a State, engaged in the prosecution under the police power of projects through governmental agencies for the promotion of the public health. Hence, it cannot be held that Judge Rice would have been warranted in finding as an undisputable inference of fact that the State in the case at bar was engaged in work impressed with the legal character of an eleemosynary corporation.

But even if that conclusion had been warranted, we 3-5 are of the opinion that it was not the intent of the General Assembly, as embodied in the Enabling Act that immunity from liability should be claimed by the State upon that ground. By the express terms of the statute it is provided that the action authorized "shall be brought under

the provisions of" Sections 3955 to 3958 inclusive, of
Volume 1 of the Civil Code, "except that punitive damages
shall not be prayed for," and "the principle of law applicable
to cases brought against any person or corporation   *   *
*   shall be applicable to the action," etc.   The State would
seem clearly to be thereby subject to liability for a wrong-
ful death caused by negligence in the same manner and to
the same extent as any person or corporation so liable.   That
the State thereby waived immunity from liability as a
sovereign, we think, is one of the points that is now *res
judicata* under the decision of this Court upon the former
appeal (115 S. C., 168; 104 S. E., 567; 13 A. L. R., 1268),
holding that the demurrer to the complaint herein was prop-
erly overruled.   With the argumentative premises, wheth-
er erroneous or not, upon which that conclusion is
predicated, we are not here concerned.   It cannot now be
assumed, certainly in the absence of any such contention on
the part of the State's counsel, that the demurrer interposed
in due season to the plaintiff's cause of action as alleged in
the complaint did not attack the validity thereof upon all
available and proper grounds.   See *Turner v. Association,*
51 S. C., 33; 27 S. E., 947.   *Long v. Hunter,* 58 S. C.,
152; 36 S. E., 579.   *Electric Co. v. Supply Co.,* 66 S. C.,
342; 44 S. E., 952.   *Mauldin v. Ry. Co.,* 73 S. C., 9; 52
S. E., 677.   If plaintiff's complaint states a good cause of
action for recovery of damages for wrongful death—a point
that has become *res judicata* under the former decision—
the waiver of the State's immunity as a sovereign has been
adjudicated.   If the State's immunity as a sovereign was
waived by the Enabling Act, the contention that while waiv-
ing its immunity as a sovereign state it retained and reserved
the lesser privilege of immunity as an eleemosynary cor-
poration is lacking in rational appeal.   The immunty from
liability of the sovereign for torts of its agents is of exactly
the same character as the immunity accorded the eleemosy-
nary corporation.   Both rest upon the same basis of reason

—the exigencies of sound public policy. When, therefore, the State divested itself of immunity from liabilty for the negligence of its agents in this case, it must be assumed that the General Assembly, the creator of the State Board of Health and the director of its activities, was duly advertent to the eleemosynary character, if any, of the service of the State's agents, on account of which a right of action was given. Our conclusion, therefore, upon this phase of the case, is that the trial Judge committed no error in refusing the motions for nonsuit and for direction of verdict.

2. As to the second question, we are of the opinion 6-8 that the Circuit Judge committed reversible error in withdrawing from the consideration of the jury the defense of the contributory negligence of the plaintiff and his agents. As clearly pointed out in the opinion of Mr. Justice Cothran, the right of the defendant to interpose and rely upon this defense was squarely presented to and decided by this Court upon the former appeal. That adjudication is now the law of this case. But that no binding force is to be attributed to the remarks of Mr. Justice Hydrick as to weight and sufficiency of the evidence upon that issue on the former trial—a question in no wise involved on that appeal—would seem clear beyond question. That sufficient evidence was adduced on the trial below to require the submission of this issue to the jury is equally clear. In view of the very full and lucid discussion of this point contained in the opinion of Mr. Justice Cothran, any further elaboroation of the reasons for the conclusion reached upon the question is deemed unnecessary. Respondent's contention that this defense was waived by defendant's counsel is not substantiated by the record. The defendant's counsel did not consent to withdraw the request to charge upon this defense until after the Circuit Judge had ruled that he would not submit the issue to the jury.

3. As to the third question, we are of the opinion that there was prejudicial error in admitting in evidence, over defendant's objection, the report of Dr. F. A. Coward.

The report in question is entitled, "Report of Dr. F. A. Coward, Director of Laboratory, State Board of Health on Anti-Typhoid Vaccine, Lot 67," is directed to "Dr. James A. Hayne, State Health Officer and Secty. State Board of Health, Columbia, S. C.," and is submitted as a "report of investigation into the circumstances surrounding the recent deaths of children following the administration of typhoid vaccine." The report contains a "summary of cases," made up from reports of attending physicians, a summary of the reports of physicians using the vaccine in question, statements as to methods of preparation and test of the vaccine, and observations and conclusions as to the cause of contamination of the vaccine and as to the cause of the four deaths reported among which were the Sandel children. Dr. Hayne testified:

"I am State Health Officer and *ex officio* Secretary of the State Board of Health. Dr. Coward is employed by the State Board of Health through me, and is paid a monthly salary from the funds appropriated to the State Board of Health for this purpose. He is not a State Official. I authorized the report to be made to me, and, for the purposes of medical research and information, authorized Dr. Coward to send the report out to the medical profession. The report was not made officially and was not incorporated in our report to the General Assembly."

Apparently, the admission of this report is sought to be sustained and justified upon the theory that it constitutes such a public record, made by virtue of competent authority, on a subject-matter of public interest, as entitled it to admission as a public or official doument under the well-established exception to the hearsay rule permitting the introduction of such records. Without entering into any extended dis-

cussion of the "public or official records" exception to the hearsay rule, we deem it necessary only to point out certain limitations upon that exception which clearly preclude the admission of this report. The document with which we are here concerned is commonly classified by text-writers upon the law of evidence as a report or inquisition. Wigmore, § 1670. As said by that eminent authority on evidence (Section 1670):

"Now an instruction or report, if made under due authority, stands upon no less favorable a footing than other official statements. * * * But the fundamental doctrine of the common law seems to have been that no authority to make an inquisition will be implied merely from the general nature of the office, and that an express authority must be created for the purpose, etc. * * * The general quality of a statement made under authority (should it exist) will suffice to admit it; but the authority which can be implied from the nature of an office is (sensibly enough) an authority to record or return those things, personally done by or before the officer."

Again (Section 1635[3]), the author says:

"Where the officer's statement is concerned with a transaction done, not by him or before him, but out of his presence (and out of the presence of his subordinates) the case is one in which obviously he can have no personal knowledge; the assumption must therefore be that his statement is inadmissible. * * * On the one hand we find a general exclusion of statements not based on personal knowledge (of the officer or his subordinates); this exclusion being rested usually on the circumstance that the duty does not extend to such matters. On the other hand we find a few kinds of statements where it has clearly been made the officer's duty to investigate and record or report irrespective of personal knowledge; in such cases the statements are admitted; but Courts are disinclined to recognize many instances as belonging within this class. Occasionally a

statute makes the result clear by expressly declaring such
statements admissible; but, in the absence of statute, courts
are found slow to infer merely from the nature of the
office any specific duty to record or certify on the faith of
information derived from other persons, matters occurring
without the officer's presence, or, at least, any duty sufficient
to render such statements admissible in evidence. This
attitude is, on the whole, and apart from specific vagaries,
a safe and practical one, because, so far as the sources of
the officer's information are not personal to himself, they
will in general be equally and sufficiently available in the
ordinary way as testimony for the party desiring to make
proof."

We know of no law imposing upon the State Board of
Health, acting through the State Health Officer or his
subordinates, the duty of reporting and recording an official
statement of the steps taken, testimony received, and con-
clusions reached on the basis of information derived from
others, in the course of a special inquiry of the kind under-
taken by Dr. Coward. Since no such specific official duty
was imposed upon Dr. Hayne, no authority conferred by
him upon Dr. Coward could transmute a hearsay report
into competent evidence as an official document. Dr. Hayne
himself states that "the report was not made officially."
Since no authority can be implied from the nature of the
State Health Officer's position to make an "official record"
of matters outside his personal knowledge and that of his
subordinates, the report of Dr. Coward lacked the express
sanction of law essential to impressing a report containing
such hearsay matters with the probative dignity and value
of an admissible official record.

But even if made officially under express authority of
law, a report or inquisition of the character of the Coward
paper is not generally admissible in evidence to prove the
truth of all matters therein contained. An official record

very closely resembling the Coward report in scope and purpose is the record of a coroner's inquest.

"The general rule is that in a prosecution for homicide the finding of a coroner or the verdict of a coronor's jury as to the manner and cause of the death of the deceased is inadmissible in evidence for any purpose." Note 4 Ann. Cas., 1020, citing cases.

"It was formerly held that the record of a coroner's inquest on a dead body was competent but not conclusive evidence of the cause of death in all civil actions, because it was the result of an inquiry made under competent public authority, to ascertain matters of public interest and concern. This rule still prevails in a few jurisdictions, but the weight of modern authority is against it." 10 R. C. L., 1128; note 4 Ann Cas., 1020, collating decisions.

See, also, Wigmore, § 1671, p. 2078, and cases cited in note 8. The danger of making a coroner's inquest, or any official investigation of the manner and cause of a person's death, a means of perpetuating testimony to be used in a civil suit, is obvious. Commenting upon the pernicious consequences of such a rule, Chief Justice Hayt, of the Supreme Court of Colorado, says:

"In case of death under suspicious circumstances, or resulting from accident, the rule permitting inquisitions to be used in evidence would result in a race and scramble to secure a favorable coroner's verdict, that would influence, and perhaps control, in case suit should be instituted, against life insurance companies upon policies of insurance, and in cases of accidents occurring as a result of negligence on the part of corporations operating railways, street car lines, mining for coal or the precious metals, etc." *Germania L. Ins. Co. v. Ross-Lewin*, 24 Colo., 43; 51 Pac., 488; 65 Am. St. Rep., 215.

In the case of *Jewett v. Boston Elevated Ry.*, 219 Mass., 528; 107 N. E., 433, the admissibility of a record even more nearly identical with the Coward report was considered.

The action was by an administrator against a corporation operating a street railway for causing the death of the plaintiff's intestate. Plaintiff, for the purpose of showing the cause of the death of his intestate, offered in evidence the report of an autopsy upon the body of the intestate made by a medical examiner, under the provisions of a statute requiring the examiner to record "every fact and circumstance tending to show the condition of the body and the cause and manner of death." The Court said:

"Under such a statutory system, we perceive no ground upon which the report of the medical examiner, or a duly authenticated copy thereof, can be admitted in evidence to show the truth of the matters therein stated or even to show that the death was caused by violence. We are aware of no decision in any jurisdiction which goes to such a length. The duty of the medical examiner is merely to ascertain and preserve certain evidence that it may be available if needed for future proceedings. The reasoning in *Allen v. Kidd*, 197 Mass., 256, is applicable; and the decisions in *P. Garvan, Inc. v. N. Y. Cent. & Hudson River R. R.*, 210 Mass., 275, 279; *Butchers Slaughtering, etc., Ass'n v. Boston*, 214 Mass., 254, 258, and *Commonwealth v. Borasky*, 214 Mass., 313, 317, state the rule which must be followed."

Of strongly persuasive force, because of similarity in character to the action at bar, is a line of Massachusetts decisions in cases against *quasi* public corporations, of which the following is an illustrative case: *Wheeler v. Inhabitants of Framingham*, 12 Cush. (Mass.), 287, was an action for injury to plaintiff's property by reason of an alleged defect in a highway. At the trial the plaintiff offered in evidence the report of an investigating committee duly chosen by the town, to the effect that the accident happened by reason of the road having been left in such condition that it was unsafe for travel. The report was duly accepted by the town at a meeting called for that purpose. The presiding Judge admitted the evidence. The Court said:

"The ruling of the Judge admitting the records of the town accepting the report of the committee, was incorrect, and cannot be sustained"—citing *Collins v. Dorchester,* 6 Cush. (Mass.), 396, and *Dudley v. Weston,* 1 Metc. (Mass.), 477.

The conclusion that the Coward report was not admissible by virtue of its alleged character as an official document is further enforced by the consideration that under the terms of the Enabling Act the State in the case at bar occupies the position of a person or private corporation legally liable for a wrongful death. The prejudicial effect of the introduction of the report was due in large measure to its tenor as an acknowledgment or admission on the part of the investigator, who was also the agent charged with the manufacture of the vaccine, that the vaccine was contaminated and that the injection thereof caused the death of plaintiff's intestate. In so far as the report contains statements of facts and transactions not within the personal knowledge of the investigator, and observations and opinions based thereon, it would clearly be inadmissible as rank hearsay in a similar action against a private corporation. For example, in action against a railway corporation for wrongful death of a passenger, the subsequent report of a claim agent sent out to investigate, made to the superintendent or president of the corporation, setting out the facts and circumstances of the death as gathered from others, and giving the agent's opinions thereon, would not be competent evidence upon any theory either to charge or exonerate the railway company. In so far as the report contains admissions of fact within the personal knowledge of Dr. Coward, tending to show negligence in the preparation of the vaccine, it was the declaration or admission of the principal's agent personally responsible therefor made long after the time of the alleged default. In such cases the applicable rule is thus stated by this Court

in *Rookard v. Railway Co.,* 84 S. C., 190; 65 S. E., 1047; 27 L. R. A. (N. S.), 435; 137 Am. St. Rep., 839.

"If an agent commits a tort, while acting within the scope of the agency, the principal is liable, but if he makes declarations or admissions concerning it, so long afterwards that they cannot be admitted as part of the *res gestæ,* the principal is not bound by them." *Patterson v. S. C. R. Co.,* 4 S. C., 153. *Aiken v. Western U. Tel. Co.,* 5 S. C., 358. *Mars v. Virginia Home Ins Co.,* 17 S. C., 519. *Piedmont Mfg. Co. v. Columbia & G. R. Co.,* 19 S. C., 354. *Petrie v. Columbia & G. R. Co.,* 27 S. C., 64; 2 S. E., 837. *Garrick v. Florida C. & P. R. Co.,* 53 S. C., 448; 31 S. E., 334; 69 Am. St. Rep., 874. *Salley v. Manchester & A. R. Co.,* 62 S. C., 129; 40 S. E., 111.

The conclusions of the Court upon the questions above discussed render unnecessary the consideration of other points raised by the exceptions.

For the reasons indicated, the judgment is reversed, and the cause remanded to the Circuit Court for a new trial.

MR. JUSTICE FRASER and MESSRS. DEVORE, SHIPP, MAULDIN, PEURIFOY and TOWNSEND, Circuit Judges, concur.

MR. JUSTICE COTHRAN: I concur in the disposition of the second and third questions and dissent as to the first. (See opinion.)

MR. CHIEF JUSTICE GARY (dissenting and concurring opinion): The appeal in this case was heard by the Court at the October term, 1921, as the Court was then constituted, with the addition of Hon. F. B. Grier, who was specially appointed to sit in the place of Mr. Justice Gage, deceased.

Acting Associate Justice Grier prepared an opinion, which would have been the opinion of the Court, if the Court *en banc* had not been called together. It is hereby adopted as the opinion of the Court, and is as follows:

"On the morning of July 13, 1915; Dr. Browning, the family physician of Mr. J. O'Neal Sandel, vaccinated with antityphoid serum, furnished gratuitously by the State of South Carolina, the two Sandel children, Thelma and Minnie, both under the age of five years. The vaccine. was made by the State Laboratory under the immediate supervision of the director of the Laboratory. The children were vaccinated with a portion of what was known and designated as lot No. 67, and were apparently all right when inoculated. Dr. Browning states that he was careful to use all proper precautions, and advised the parents to keep the children as quiet as possible and give them a very light diet. On the same afternoon about 4:30 o'clock the children accompanied their mother to Lone Star, a short distance from the Sandel home. After returning home. from Lone Star they showed symptoms of illness and grew rapidly worse. Dr. Browning was called in during the night and reached the Sandel home about 3 o'clock. He found the children in practically a comatose condition. The child in this case lived 19 hours from the time it was given the vaccine, and the other child died the following morning. Following the death of these two children, Dr. Hayne, Secretary and Chief Executive Officer of the State. Board of Health, instructed Dr. Coward, director of the laboratory, for the purpose of medical research and information, to investigate and report into the circumstances surrounding their death. Dr. Coward, pursuant to these instructions, made a full and thorough investigation and reported the results with his conclusions to Dr. Hayne, as State Health Officer and Secretary of the State Board of Health. Unused portions of the vaccine were tested by Dr. Coward, and also by Dr. Browning, and found to contain pus germs, but the entire lot was not contaminated. The conclusion reached by Dr. Coward was that the contamination must have occurred in the bottling. In March, 1918, the State, by an Act of the Legislature. (30 St. at Large 1097) gave its

consent to the administrator of Thelma and Minnie Sandel, deceased, to bring suit against the State of South Carolina for the recovery of such damages as may be proper, if any, on account of the death of the two children. The Act further provides that the action or actions shall be brought under the provisions of and for benefit of the persons named in Sections 3955 to 3958, both inclusive (Volume 1, Code 1912), except that punitive damages shall not be prayed for in the complaint, and the principles of law applicable to cases brought against any person or corporation organized under the laws of the State of South Carolina are made applicable to the action or actions authorized to be brought. The Attorney General of the State is directed to answer the complaint and to protect the interest of the State; either side to have the right of appeal to the Supreme Court as in ordinary civil actions.

"The plaintiff herein, as administrator of the estate of the two children, Thelma and Minnie, brought separate actions against the State of South Carolina, pursuant to the privilege granted by the Act of the Legislature, referred. to above, for the death of the children, alleging in each case that death was due to contamination in the vaccine, that it contained pus germs or some other dangerous germs unknown to plaintiff, and that the contamination was the result of negligence on the part of the State in the manufacture or bottling of the vaccine. The answer of the State was a general denial, and as an affirmative defense contributory negligence. The cases were first tried together before Judge Sease, and resulted in a verdict for the State. An appeal was taken to the Supreme Court by the plaintiff, and the judgment reversed and a new trial granted. This case was tried separately before Judge Rice and a jury, and resulted in a verdict and judgment in favor of the plaintiff, from which this appeal is prosecuted by the State.

"It is familiar law that when a judgment is reversed or affirmed by the Supreme Court every point made and dis-

tinctly stated in the case must be considered as decided and
is the law of the case on all subsequent trials. When such
questions are decided they become *res judicata,* and the
Court—after the remittitur has been handed down—can-
not render a different decision in the case on any subsequent
appeal, even if it should be convinced that there was error
in its former decision. This proposition is in the language
of the decisions on the subject. But on a new trial, in so
far as the testimony is concerned, the parties are in the
same position as they were before any trial was had. It
would be a vain thing to order a new trial if the facts on
the first trial were to govern on all subsequent trials. There-
fore, when an appeal is had from a second or subsequent
trial the first inquiry is whether on the new trial the testi-
mony adduced makes out a substantially different case from
that presented to the Court on the former appeal.

"A very careful examination of the record of the trial of
this case before Judge Rice demonstrates that the testimony
on behalf of the plaintiff in all material respects is the same
as on the former trial, and while the defendant on this trial
has offered additional evidence and with more elaboration
developed the theory of its defense, there is no substantial
change in the nature of the issues raised. The record pre-
sents now, as it did on the first trial, a conflict of testimony
on behalf of plaintiff and defendant on the material issues
in the case. This being true, the legal propositions an-
nounced by the Court on the former appeal are controlling
and determinative of the same questions on this appeal. On
the former appeal the Court held that the basis of this action
was negligence; that the Act of the Legislature allows a
recovery against the State for the negligence of its agents
and servants; that the plaintiff had offered evidence tending
to establish these allegations of negligence; that the Act
did not create a new liability; that the liability already
existed and was recognized at common law; that the only
obstacle in plaintiff's path to the enforcement of it was the

State's immunity from suit without its consent; that the Act by giving the State's consent to be sued provided a remedy; and, further, that the State had the power—acting through the Legislature—to recognize claims against it founded on justice and equity, and might even recognize some moral obligations. All of these questions are *res judicata,* and these are the principal questions presented by this appeal. The other questions raised are merely those that would ordinarily arise in the trial of a case, in the ruling of the trial Judge on the admissibility of testimony, and in the charge to the jury.

"We have grouped the exceptions and will consider them in this way.

"Exceptions 1 to 5, inclusive, assign error on the part of the trial Judge in withdrawing from the jury the defense of contributory negligence. On the former appeal the Court held that there was no evidence to sustain this defense, and that it could very properly have been withdrawn from the jury. On this trial the testimony on this issue is substantially the same, and the trial Judge was right in withdrawing this defense.

"There is another reason why it would have been improper to submit this issue to the jury. This action—by consent of the State—was brought under the terms and provisions of our statute, commonly referred to as Lord Campbell's Act. It has been decided in numerous cases that the right of action under Lord Campbell's Act is a new one, and not a mere revival of the cause of action which belonged to the intestate; the right of the administrator to recover depends upon the right of the deceased to recover if he had survived the injury. If, therefore, the intestate could have recovered notwithstanding the contributory negligence of its parent, the plaintiff as administrator may recover in an action by the administrator under the provisions of under Lord Campbell's Act the contributory negligence of Lord Campbell's Act. In an action by the administrator

the parent does not defeat the right of the administrator to recover. This particular action is brought and can only be maintained by the administrator under the provisions of Lord Campbell's Act. The writer of the opinion was under the impression that at common law the death of a human being, although clearly involving pecuniary loss, is not the ground of an action for damages, and that a father was not entitled to recover damages at common law for the negligent killing of his infant child, that a sovereign state at common law was not liable for the torts of its officers and agents. The Court, however, in this case on the former appeal, held 'the Act [authorizing this suit] does not create a liability which did not exist before its passage.' The liability is one that is recognized by the common law. This holding is *res judicata,* and is not open to discussion or subject to a different opinion..

"Exceptions 9 and 12 assign error, in that his Honor refused to grant a nonsuit or to direct a verdict:

"(a) In that there was no testimony tending to establish negligence on the part of the State as the direct and proximate cause of the death of the intestate.

"(b) That the testimony shows that the State was acting in the capacity of an eleemosynary corporation; that the Act of the Legislature did nothing more than waive immunity of the State from suit by virtue of its sovereignty, but did not waive its immunity from liability for the torts of its agents.

"If these questions were for the first time before the Court, opportunity would be afforded for a full discussion and expression of opinion; but on the former appeal the Court held that there was testimony substantially tending to establish the allegations of negligence, and on this appeal plaintiff's testimony is in all material respects the same as on the former trial.

"The second ground of the motion on the former appeal was urged and necessarily embraced in the demurrer to the

complaint which was overruled. The Constitution, as construed and applied by our Court in an unbroken line of decisions, gives a binding force and finality on this appeal to the former opinion, which admits of no question and precludes discussion. These exceptions for this reason are overruled.

"Exceptions 6 and 7 allege error in charging plaintiff's third request. Plaintiff's third request is as follows:

" 'That the fact that injury to the plaintiff's intestate was not anticipated by the defendant could not excuse it in being negligent, if the jury find that the negligent acts of the defendant were a proximate cause of the injury, and that but for such negligence the injury would not have occurred.'

"In exception 6 the defendant assigns error that without modification the charge assumes the proof of negligence.

"In the seventh exception error is assigned that the charge disregards the doctrine enunciated in the Sandel Case on the former appeal, to wit, there may be concurring causes operating contemporaneously to produce the injury, and such as to have prevented the injury happening, in the absence of all or any of them, and that, unless such concurring causes through reasonable foresight and diligence could have been guarded against, liability would not have attached to the defendant.

"It is obvious that the request contains a sound proposition of law. Does it assume the proof of negligence as charged in exception 6? If considered entirely apart and without reference to the charge as a whole, the verbiage is inapt; but this is not the rule. The charge must be considered as a whole, and if, when so considered, it is free from error, the requirements of the law are satisfied. The purpose of a charge is to enlighten the jury on the principles of law applicable to the case on trial. If a charge to the jury contains conflicting propositions, a new trial should be granted. It is not possible to hope for a satisfactory finding of fact if the charge is so conflicting and confusing

as to convey no clear and definite meaning to the jury who are to be guided by it. In this case the charge is remarkably clear and free from error. Judge Rice time and again instructed the jury that the basis of the action was negligence and that the burden was on the plaintiff to establish these allegations by the clear weight of the evidence to the satisfaction of the jury and that plaintiff must show that such negligence was the direct and proximate cause of the death of the child.

"Now, as to the error assigned by the seventh exception: The request as submitted was complete in and of itself and covered a proposition of law applicable to the case. If defendant wished further elaboration, it was its duty to call the matter to the attention of the Court. There was no error of law in the request as submitted, and it has never been held, so far as we recall, that the failure of the judge to elaborate a proposition so as to contain other pertinent and applicable principles is error. The law cannot all be charged in one sentence, nor in one request. All that is required is that the request contain a sound principal of law applicable to the case.

"The eighth exception assigns error in charging plaintiff's fifth request. The fifth request contains a perfectly sound proposition of law and was properly charged.

"The eleventh exception assigns error in excluding the letter of Dr. Walter to Dr. Coward, it being one of the many received by Dr. Coward in connection with his investigation. This letter is set out as an exhibit in the case and appears to be in reply to a letter from Dr. Coward in reference to lot No. 67 of the typhoid vaccine, which was the subject of investigation by Dr. Coward following the death of the Sandel children. The first few lines of the letter states that the doctor had used several doses of this lot of vaccine, the youngest patient 10 years old, and the next 12, and the others adults; that he had noticed nothing unusual in the way of severe reaction. The remaining por-

tion of the letter states what Dr. Walter heard about the
Sandel children eating bananas, and expresses the belief
that their death was not due to the vaccine. The doctor
does not claim to know anything about the facts and cir-
cumstances connected with the death of the Sandel children,
and quite evidently he was not asked for anything by Dr.
Coward in reference to this. The letter is so obviously
hearsay as to require no further discussion, and was prop-
erly excluded. It is contended, however, that, since the re-
port of Dr. Coward was admitted, this letter as one of
many on which his report was predicated, should also be
admitted. Counsel for appellant have furnished no citation
of authority sustaining this contention, and we feel quite
sure that none can be found. The report of Dr. Coward,
if admissible, could only be by way of exception to the
hearsay rule, and its admission in evidence would not make
competent the source of inquiry and data gathered by Dr.
Coward as the basis of his report. The letter of Dr. Walter
must be considered in and of itself, and without reference
to the report of Dr. Coward, and when so considered it is
obviously mere hearsay and properly excluded.

"The tenth exception assigns error in admitting in evi-
dence the report of Dr. Coward, because said report was
hearsay and based upon unsworn-to correspondence. This
report was made by the director of the State Laboratory to
the Chief Executive Officer of the State Board of Health
pursuant to a direct command from him that he make the
investigation and report the results in the interest of medical
research. The Constitution of 1895 imposes on the Gen-
eral Assembly the duty to create a board of health with full
power and authority to make such regulations as will pro-
tect the health of the community and abate nuisances. Fol-
lowing this mandate of the Constitution, the General As-
sembly created the medical association and their successors
in their corporate capacity, together with the Attorney Gen-
eral and the Comptroller General of the State and their suc-

cessors as a Board of Health of the State of South Carolina, to be known as the State Board of Health. It is made the duty of this board through its representatives to investigate the causes, character, and means of preventing such epidemic and endemic diseases as the State is liable to suffer from. It has the right to make rules and regulations in line with its powers and duties which have the force of law with reference to the subjects covered by its authority. Its powers, duties, and responsibility are coextensive with the necessities and welfare of the State in all matters of health and sanitation. The State Health Officer, who is also the secretary of the board, is appointed by the Governor on the recommendation of the executive committee of the board, and his duties and authority are practically as broad and extensive as those conferred on the board.

"When this report was first offered in evidence, the trial Judge sustained the objection and ruled it out, holding that it must first appear that the report was official and authorized. Dr. Hayne was then called as a witness and testified that he was State Health Officer and *ex officio* secretary of the State Board of Health, and that he authorized and directed the investigation and report to be made by Dr. Coward for the purposes of medical research and information; that the report was not made officially, and was not incorporated in the annual report of the board to the General Assembly. After this the report was again offered and admitted in evidence over objection, and among others that it was not an official report and not made by an officer in the discharge of his statutory duties; that the said report was merely an unsworn-to document *ex parte* and hearsay evidence.

"There are a great many exceptions to the hearsay rule, and the question here is whether this report falls within one of the recognized exceptions.

" 'Whether a given statement was made under an official duty depends largely upon the nature of the office, the subject of the statement, and the form of its making. No express statute or regulation is needed for creating the authority or duty to make the statement. The existence of the duty and not the source of its creation is the sanctioning circumstance. Not all, nor the greater part, of an officer's conceded duties are placed upon him by the written law. They may arise from the oral and casual instructions of a superior, or from the functions necessarily inherent in the office. Where the nature of the office fairly requires or renders appropriate the making and recording of a specific statement, that statement is to be regarded as made under official duty.' Wigmore on Evidence, Vol. 3, Par. 1633.

"In the case of *Evanston v. Gunn,* 99 U. S., 660; 25 L. Ed., 306, the admission in evidence of a record kept by a person employed by the United States Signal Service at Chicago was objected to for the reason that there was no law authorizing such records to be used, and because it was not competent testimony. The Supreme Court through Mr. Justice Strong, who delivered the unanimous opinion of the Court, held:

" 'It may be admitted there is no statute expressly authorizing the admission of such a record, as proof of the facts stated in it, but many records are properly admitted without the aid of any statute. The inquiry to be made is, What is the character of the instrument? The record admitted in this case was not a private entry or memorandum. It had been kept by a person whose public duty it was to record truly the facts stated in it. * * * They are, as we have seen, of a public character, kept for public purposes, and so immediately before the eyes of the community that inaccuracies, if they should exist, could hardly escape exposure. They come, therefore, within the rule which admits in evidence "official registers or records kept by persons in public office in which they are required, either by

statute or by the nature of their office, to write down particular transactions occurring in the course of their public duties or under their personal observation." Taylor, Evid. § 1429. 1 Greenl. Evid. § 483. To entitle them to admission it is not necessary that a statute requires them to be kept. It is sufficient that they are kept in the discharge of a public duty. 1 Greenl. Evid. § 496. Nor need they be kept by a public officer himself, if the entries are made under his direction by a person authorized by him. *Galt v. Galloway,* 4 Pet., 332. It is hardly necessary to refer to judicial decisions illustrating the rule. They are numerous.'

"Tested by the foregoing and the broad and far-reaching powers conferred on the board and its chief executive officer by the Constitution and statutes of the State, it is apparent that the report in this case was made and must be regarded as made under official duty. The report is in writing and refers to the specific subject-matter included in the duty and to all of the facts about which it was necessary to be informed in order to make the report. Dr. Wigmore, in his exhaustive work on Evidence, Vol. 3, Par. 1637, has grouped documents of this character into three classes as follows: Registers (or records), returns (including reports), and certificates (including certified copies).

"This document falls in the second classification, to wit, a return or report, which is defined by the same author, as:

" 'Only a single document made separately for each transaction as occasion arises. It is distinguished from a record or a return proper in that a return deals with something personally done or observed by the officer, while a report merely records the results of his investigation as to something that has occurred out of his presence. It is sometimes referred to as an inquisition or inquiry, which suggests more clearly its special quality, namely, the resting upon means of information other than original personal observation.

" 'Inquisitions, which are of a public nature, and taken under competent authority, to ascertain a matter of public interest, are, upon principles already announced, admissible in evidence against all the world. * * * It is not essential to the reception of evidence of this nature that the inquiry should have been made by virtue of some judicial authority and by means of witnesses examined upon oath; it is sufficient if it was made by virtue of competent authority on behalf of the public and on a subject matter of public interest. * * * It is, however, of the very essence of evidence of this nature that the inquiry should have been made under proper authority; in general, therefore, unless the authority be in its nature notorious, it must be proved by the production of the commission; as in the case of an inquisition *post mortem* and such private offices.

" 'It is this principle of express authority which serves to explain the attitude of the common law toward the use of inquisitions or reports.' Wigmore Evid. Par. 1670.

"This is the rule and the reason for the rule. It therefore very clearly appears that the objection to the report that it is *ex parte* and based on unsworn statements and hearsay is not the proper test. The circumstance that the report is based on information derived from sources other than the personal knowledge of the party making it is not sufficient to exclude it from evidence. The proper inquiry is as to the character of the instrument and whether made by virtue of competent authority on behalf of the public and on a subject matter of public interest. Applying these principles, the report of Dr. Coward was clearly admissible.

"Exception 13 assigns error in refusing defendant's motion for a new trial. The first seven grounds of the motion are identical with the exceptions which have already been considered and passed upon.

"The eighth, ninth, and tenth assign error in the charge of his Honor to the jury in the particulars stated. We have already—in considering the exceptions heretofore—

held that the charge was free from error and contained a correct statement of the applicable law. This of necessity, involved a consideration of the errors assigned in these particular grounds, 8, 9 and 10, of the motion for a new trial. It would serve no good purpose to elaborate and discuss these in detail. They are without merit and overruled.

"The eleventh ground of the motion complains that the verdict of the jury shows that punitive damages were awarded in violation of the statutes authorizing this suit. It is true the verdict is for a large amount, but there is nothing in the record before us to indicate that it includes punitive damages. The trial Judge properly instructed the jury as to the correct measure of damages and it cannot be assumed—without some affirmative showing—that the jury disregarded the charge and included punitive damages. The measure of damage is fixed by the statute under which the action is brought, and the trial Judge charged the jury in the language of the Supreme Court construing the statute in this respect. In a law case this Court has jurisdiction to correct errors of law only, and cannot weigh or consider testimony about disputed matters of fact. This responsibility on a motion for a new trial is placed on the trial Judge, who has full power and authority, and whose duty it is in every case tried before him to see that the verdict is a true and just one."

The writer of this opinion desires to supplement said opinion with the following:

When I read the exceedingly able opinion of Mr. Justice Grier it was my intention merely to concur in it. But certain propositions announced by Mr. Justice Cothran, in his dissenting opinion, caused me to write a concurring opinion on one or two questions.

In order to understand clearly the rulings of Mr. Justice Hydrick, who delivered the opinion of the Court on the former appeal in this case, touching the demurrer to the complaint on the grounds therein mentioned, it will be nec-

essary to quote somewhat at length the reason he assigns for overruling the demurrer. We thus quote:

"The defendant asked this Court to sustain the judgment on the grounds taken by a demurrer to the complaint which was overruled by the Circuit Court. The grounds of demurrer were that the act by authority of which this action was brought violates the following provisions of the Constitution: Section 5 of Article 1, which provides that no person shall be deprived of his life, liberty, or property without due process of law; Section 17 of Article 3, which provides that every act shall relate to but one subject, which shall be expressed in its title; and Section 34 of Article 3, which prohibits the enactment of special laws on certain specified subjects, and provides that, in all other cases where a general law can be made applicable, no special law shall be enacted. The demurrer was properly overruled.

"The provision first cited is a limitation upon the power of the State, and was intended to protect the citizens against arbitrary action on the part of the State. The act does not deprive any person of his life, liberty, or property. Nor can it be said that it may result in depriving the State of its property, for 'deprived' connotes want of consent, and the State has given its consent. Certainly the deprivation, if it can be so called, will not be without due process of law, for that is provided for in the requirement that plaintiff's claim shall be established in an action in a Court of competent jurisdiction. *The State, acting through the Legislature, had the power, which it always has and should exercise on proper occasion, to recognize claims against it, founded on justice, and equity. It may even recognize some moral obligations.* Graham v. State, 109 S. C., 301; 96 S. E., 138. *The act does not create a liability which did not exist before its passage. The liability is one that is recognized by the common law. The only obstacle that lay in plaintiff's path to the enforcement of it was the State's immunity from suit without its consent. The act, there-*

*fore, by giving consent, merely provides a remedy where none existed before.*

"The title of the act reads: 'An act to authorize and empower the administrator or administrators of Thelma Sandel and Minnie Sandel, deceased, to bring an action against the State of South Carolina.'

"There is no provision of the act which is not germane to the title or fairly within its scope.

"The provision last mentioned was not intended to apply to an act of this kind. It has never been the policy of this State to give general consent to be sued in the Courts on its liabilities. Whether it will consent or not has always been made to depend upon the facts and circumstances peculiar to each case, or class of cases, and the right to determine each application on its own merits has been exercised by the Legislature under every Constitution that has been adopted. It has been exercised under the present Constitution ever since its adoption in 1895, and in numerous cases. Nowhere in the Constitution is there any express declaration of intention to depart from that well known policy; but a contrary intention is plainly to be implied from the circumstances that the provisions of Section 2 of Article 17, that 'The General Assembly may direct by law in what manner claims against the State may be established and adjusted.' "

"The letter of a particular provision will not prevail over the clear intention to be gathered from the whole instrument. A general law, consonant with the settled policy of the State, cannot be made applicable in the circumstances under which this act was passed. They were novel and extraordinary. Such an event never occurred before, and may never happen again. The very nature of the case called for a special rather than a general law."

Mr. Justice Cothran, in his dissenting opinion, after quoting the language from the opinion of Mr. Justice Hydrick, which we have italicized, says:

"The question at issue upon this phase of the case under discussion by the Court, was the demurrer of the State to the plaintiff's complaint. The grounds of the demurrer, as gathered from the opinion, all that the Court now has access to, were that the act of 1918 violates the three provisions of the Constitution: (1) The due process clause; (2) the requirement that every act shall relate to but one subject which shall be expressed in its title; (3) the inhibition against special legislation. 115 S. C., 181; 104 S. E., 571; 13 A. L. R., 1268. The three objections are taken up and disposed of against the contention of the State. With that conclusion the Court is now in this case absolutely bound; it is not only *res judicata* but the law of the case. The declaration that no new liability was created by the act was entirely proper in disposing of the constitutional objection which had been raised, that the body of the act was more extensive than the title. It is the only ground as we shall see, upon which the constitutionality of the act, so far as this objection was concerned, could have been sustained. The other propositions announced are entirely foreign to the issue, are therefore *obiter,* and are so crowded with error that they cannot be followed."

He also used this language:

"It is conceded that the State, by the act of 1918, has waived, in favor of the plaintiff, its immunity from suit; and the pivotal question is, has it by that Act conferred upon the plaintiff the right, which theretofore did not exist, to recover damages for an injury resulting from the negligence of its agents?

"The title of the act is significanit: 'An act to authorize and empower the administrator or administrators of Thelma Sandel and Minnie Sandel *to bring action* against the State of South Carolina.'

"There is certainly nothing in the title indicative of a purpose to do aught than to waive the State's immunity from

suit; which alone is expressed in the permisison 'to bring action.'

"In the body of the act the permission is given to bring action 'for the recovery of such damages *as may be proper,* if any, on account of the death of the said Thelma Sandel and Minnie Sandel at Lone Star, South Carolina, in the year 1915, following the injection of serum furnished by the State of South Carolina.'

"There is no direct indication that the action is to be based upon the negligence of the agents of the State, or that the State intended to waive its immunity from liability on account of such negligence. *Doubtless the inference is reasonable that the foundation of the suit was expected to be the negligence of the State's agents;* but there is not even an inference that the State intended to waive its immunity from liability on account thereof." (Italics added.)

It is conceded that the act waives the immunity of the State from suit, but it is contended that the plaintiff has not a good cause of action by reason of the fact that there is nothing in the act which manifests an intention on the part of the Legislature to waive, also, its immunity from liability. This question involves the construction of the act, the title of which is as follows:

"An act to authorize * * * the administrator or administrators of Thelma Sandel and Minnie Sandel, deceased, to bring action against the State of South Carolina."

The act provides as follows:

"That the administrator or administrators of Thelma Sandel and Minnie Sandel, deceased, are hereby authorized and empowered to bring action in the Court of Common Pleas for Richland County against the State of South Carolina, for the recovery of such damages as may be proper, if any, on account of the death of the said Thelma Sandel and Minnie Sandel at Lone Star, South Carolina, in the year 1915, following the injection of serum furnished by the State of South Carolina. The action or actions, shall be brought

under the provisions of, and for the benefit of, the persons named in Sections 3955 to 3958, both inclusive, of Volume 1, Code of Laws of S. C., 1912, except that punitive damages shall not be prayed for in the complaint, and the principle of law applicable to cases brought against any person or corporation, organized under the laws of South Carolina, shall be applicable to the action or actions, *hereby authorized to be brought*. The action or actions shall be commenced by the service of a summons and complaint under the Code of Civil Procedure, and the same shall be served upon the Attorney General of the State, who is hereby directed to answer the same, and to protect the interest of the State, either side to have a right of appeal to the Supreme Court, as in ordinary civil actions." (Italics added.)

Section 3955 aforesaid is as follows:

"Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person or corporation who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony."

Section 2, Art. 17, of the Constitution is as follows:

"The General Assembly may direct by law, in what manner claims against the State may be established and adjusted."

In construing the Act there are certain well-established principles to which we desire to call attention. They are as follows:

"It must always be conceded that the proper authority to determine what should and what should not constitute a public burden is the legislative department of the State.

And in determining this question the Legislature cannot be held to any technical rule. Not only are certain expenditures essential to the continued existence of the government and the performance of its ordinary functions, but as a matter of policy it may sometimes be proper to assume other burdens that rest entirely on considerations of honor, gratitude, or charity. There will, therefore, be necessary expenditures, and expenditures which rest upon considerations of policy only, and, in regard to the one, as much as to the other, the decision of that department to which alone questions of State policy are addressed, must be accepted as conclusive." Cooley, Con. Lim., 599, 600.

"We think there can be no doubt that the General Assembly has the power to authorize taxation for any public purpose. In fact, that, in the absence of a constitutional inhibition, this power is inherent and unlimited, with no check except the intelligence of the representative and the ballot box of the elector. Cooley, Con. Lim., and the cases ther cited. *Feldman v. City Council,* 23 S. C., 57; 55 Am. Rep., 6. * * * What is the meaning of the term 'public'? This term is opposed to the term private; and, according to the best lexicographers, means, 'pertaining to, or belonging to, the people, relating to a nation, state, or community.' * * * There is high authority for saying that such legislation would be valid with or without the consent of the people. The only check to an unwise exercise thereof, as we have said above being not the Courts, but the intelligence of the General Assembly and the ballot box." *State v. Whitesides,* 30 S. C., 584, 585; 9 S. E., 661; 3 L. R. A., 777.

These authorities are in accord with the principles announced in the case of *Graham v. State,* 109 S. C., 301; 96 S. E., 138.

In the light of these authorities, we proceed to the construction of the act for the purpose of determining whether it shows upon its face, that it not only waived the immunity

of the State from suit, but likewise the immunity of the State from liability.

The act provides (1) that the representative of the plaintiff was thereby authorized and empowered to bring action against the State for the recovery of damages on account of the death of the plaintiff, following the injection of serum furnished by the State. Why was the Legislature willing to allow an action against the State for the recovery of damages? The answer is in the act itself: On acount of the death of the Sandel children, following the injection of serum furnished by the State of South Carolina. The Legislature, realizing the great importance of vaccination, as a preventive of smallpox, and that it was of the deepest interest to the public, knew that something had to be done to restore public confidence in vaccination when the serum injected was furnished by the State of South Carolina. No doubt the tendency of this act was to assure the public that the State would use every precaution to guard against fatal results; and that it would in exceptional cases of hardship, endeavor to repair the wrong by giving pecuniary relief to the family of the unfortunate victims, where death resulted from impure serum furnished by the State. The act was therefore intended to subserve a public purpose.

Furthermore, if the Legislature did not intend to waive the immunity of the State from liability, why did it prescribe the remedy for recovering damages, if it did not intend that damages could be recovered on the conditions mentioned in the act? The presumption is that the Legislature intended practical results, and not to keep the promise to the ear, and break it to the hope, by creating an action with a string to it, and which could not be enforced.

It is also contended that the words, "the liability is one that is recognized at common law," are mere *obiter* and, as they state an erroneous principle of law, that there is nothing in the case showing liability on the part of the State; and therefore that the plaintiff cannot sue for

damages; in other words, that the complaint does not state facts sufficient to constitute a cause of action.

In the first place there is no exception raising this question. Furthermore, we have set out the facts at length concerning this statement, to show that it was merely a reason assigned by Mr. Justice Hydrick for his ruling that the grounds of demurrer to the complaint were properly overruled. It is not deemed necessary to cite authorities to sustain the proposition that the reasons assigned by the Court form no part of the judgment.

Again, even if there was error in the principle announced in the former opinion, it is *res adjudicata.* In the case of *Carpenter v. Lewis,* 65 S. C., 400; 43 S. E., 881, the Court said:

"When this Court rendered the former opinion in this case, it was under the impression that the foregoing calculation was in conformity with the principles therein announced. In this it now sees it was mistaken. Nevertheless, that question is *res judicata* as to the defendant."

See, also, *Jones v. Ry.,* 65 S. C., 410; 43 S. E., 884.

There are no other grounds of demurrer now before the Court than those which were before the Court on the former trial. It is not denied that the doctrine of *res adjudicata* is applicable to them. The effect of granting a new trial, for error in the reason assigned in showing that the demurrer was properly overruled, would be to make the reasoning of the Court paramount to its ruling upon the question under consideration. It is not necessary to determine whether the language used on the former appeal was erroneous, for even though it should be conceded that they were erroneous, the doctrine of *res adjudicata* is applicable to them. But even if the doctrine of *res adjudicata* is not applicable, and it should even be conceded that the ruling was erroneous, the error, however, would be immaterial for the reason that we have already shown the act created a liability on the part of the State. Furthermore,

if the construction which we have placed upon the act as
to the creation of a liability on the part of the State, and
the ruling of Mr. Justice Hydrick that the liability is one
that is recognized at comon law are inconsistent. Neverthe-
less, when there are two inconsistent rulings, the conclusion
of the Court will be referred to that which is based upon
a sound principle, and the other ruling will be disregarded
as surplusage.

The judgment of this Court should be that the judgment
of the Circuit Court is affirmed.

MR. JUSTICE WATTS and MESSRS. R. W. MEMMINGER and
I. W. BOWMAN, Circuit Judges, concur.

MR. JUSTICE COTHRAN (concurring and dissenting):
Action by plaintiff as administrator of the estate of Thelma
Sandel, on account of the alleged wrongful death of the
intestate, caused by the administration of impure typhoid
vaccine, manufactured and supplied by the State Board of
Health.

The action against the State was instituted under the
authority of an act approved March 9, 1918, entitled:

"An act to authorize and empower the administrator or
administrators of Thelma Sandel and Minnie Sandel, de-
ceased, to bring action against the State of South Carolina."
30 Stat. 1097.

The act authorizes the action to be brought—

"For the recovery of such damages as may be proper,
if any, on account of the death of the said Thelma Sandel
and Minnie Sandel at Lone Star, South Carolina, in the
year 1915, following the injection of serum furnished by
the State of South Carolina."

The complaint alleges that the infection which followed
the injection of the serum was caused by the contamination
of the serum or vaccine with pus germs, rendering it impure
and unfit for administration to a human being; that the
contamination was due to the negligence of the agents of
the State in the manufacture of the serum in certain specified

particulars which need not be detailed referring to the manner of handling, bottling, and inspection of the medicine, and to the condition of the laboratory in which it was manufactured.

The answer contains a denial of the material allegations of the complaint, and sets up as a defense the contributory negligence of the plaintiff in not observing the precautionary measures required in administering the vaccine, or in the care of the patient, or in the failure to observe directions.

It may be stated in this connection that the plea of contributory negligence is set forth in an inartificial fashion; but, as no objection was made to its form by demurrer or motion, the objections urged by the respondent in argument will not be considered.

Separate actions were instituted by the plaintiff as administrator of the two children. The two cases were tried together before Judge Sease and a jury, and a verdict was rendered in each case in favor of the defendant. Upon appeal this Court reversed the judgments and remanded the cases for new trials. The case of Thelma Sandel was then brought to trial before Judge Rice and a jury, and resulted in a verdict of $25,250 in favor of the plaintiff. From the judgment entered upon that verdict the defendant has appealed.

The evidence tended to establish the following facts:

The plaintiff lived with his family, a wife, and (at least) two children, girls, both under 5 years of age, near Lone Star, in Calhoun County; on the morning of July 13, 1915, Dr. Browning, the family physician, was at the Sandel home, and the suggestion was made that the two girls be vaccinated with the antityphoid serum. It was done about 11 a. m., and the parents were advised "to keep the children as quiet as possible and to give them a very light diet;" at dinner they were given only rice and milk; about 4:30 p. m. the same day Mrs. Sandel took the two girls with her to Lone Star, some two miles distant. They returned home,

showed symptoms of illness very soon thereafter and grew rapidly worse; Dr. Browning was called about 3 a. m., during the night, but could do nothing for them; Thelma died about.6 o'clock a. m. and Minnie the following morning.

Upon report of the deaths of these children, Dr. Hayne, secretary and chief executive officer of the State Board of Health, ordered an investigation and report. Accordingly Dr. Coward, director of the laboratory in which the serum was manufactured, bottled, and distributed, made a full and thorough investigation and report, which is set out in the "case." From the report alone there is sufficient ground for a reasonable inference that the serum was contaminated and that its administration caused the deaths of the children. There was at least sufficient evidence of these facts to require the submission of the issue to the jury, and that the contamination was due to the negligence of the agents of the State engaged in the manufacture, bottling, and handling of the serum. Opposed to this theory was considerable evidence on the part of the State that the deaths were due to protein poisoning, and could not have been caused by the inoculation of the pus germs which the serum admittedly contained; though this is weakened by the admission of Dr. Coward that "criticism can only be directed at the failure of technic to produce and administer a pure vaccine." At any rate this was a question for the jury, which was properly submitted to them and their verdict shows a resolution of the issue against the State. In the present state of the case it must be assumed, therefore, that the deaths were due to contamination of the serum created by the negligence of the State's agents.

The Circuit Judge, upon motion of the plaintiff, directed the jury, in conformity with his construction of the opinion upon the former appeal, that there was no evidence tending to sustain the defense of contributory negligence, and eliminated that issue from their consideration.

The appeal presents, among others, the following questions for discussion:

(1) Was there error in withdrawing from the consideration of the jury the question of the contributory negligence of the plaintiff and his agents?

(2) Was there error in admitting the report of Dr. Coward?

(3) Was there error in excluding the letter of Dr. Walter?

(4) Was there error in not holding that the State was not liable at common law, or under the act of 1918, for the negligence of its agents?

(5) Was there error in not holding that the State, in the matter of distributing free antitoxin, occupied the position of a charitable institution, and was not on that account liable either at common law or under the Act of 1918, for the negligence of its agents?

Other questions are raised by the exceptions, the consideration of which is rendered unnecessary by the disposition of the foregoing.

1. The first question: Was there error in withdrawing from the consideration of the jury the question of the contributory negligence of the plaintiff and his agents?

There was abundant testimony that the parents of the children flagrantly disobeyed and disregarded the positive and specific instructions of the family physician as to the treatment of the children following the inoculation. It was testified to by the expert physicians that after the inoculation absolute quiet and inaction were essential; so much so that inoculation should be made in the afternoon to insure restfulness at the normal period of reaction. Dr. Browning testified: "I cautioned Mrs. Sandel to keep the children quiet as possible and to give them a very light diet;" that the normal time for the reaction was about 4 or 5 o'clock that afternoon; and that the reaction in this case came at the normal time. About 4:30 p. m. Mrs. Sandel took the

two children with her in an open buggy, through the hot July sun, to Lone Star, about 1½ or 2 miles distant; as soon as they returned both were taken sick. Dr. Parker testified: "In my opinion evidently the children had stirred around too much in the hot sun." Mr. Sandel testified: "I reckon that ride kind of got her stirred up." Dr. Walter testified: "If at about the time for the normal reaction those children were permitted, on the 15th day of July, which we can reasonably assume was a very hot day, to go a mile and a half to a neighboring town and back, I would consider that would tend to augment or exaggerate the reaction, and I think it would also lower their resistance, if the reaction took place." Dr. Ward testified: "If these children were vaccinated at 11 o'clock of that day and permitted to go to a town a mile and a half away in the afternoon at 4 o'clock, about the usual time for the reaction, that would have a tendency to make it much more severe."

It appears that the mother and father were both inoculated at the same time and with serum of the same lot; the reaction in their cases was not exaggerated; also that the reaction in an adult is usually more severe than in a child; which facts reasonably tend to support the inference that there must have been some abnormal condition in the children, produced by the failure to observe the precautions given or by some other cause.

It is contended by the respondent that the testimony upon the issue of contributory negligence is the same upon this trial as upon the first, and that the Court having held in its opinion upon the former appeal that "there was no evidence to sustain that defense," the matter is *res judicata.*

Neither of these positions should be sustained. In the first place, the record of the evidence taken upon the first trial is not now before the Court, and the Court has no opportunity to compare it with the evidence upon this trial and thereby to verify the statement that they are practically

the same. All that appears in this record, as to what was in evidence upon the former trial, is a brief abstract, in which it is stated that both Mr. Sandel and Mrs. Sandel testified that all precautionary measures were taken in the inoculation and treatment of the children, and that they were not permitted any indulgences or indiscretions, that they had been properly guarded against any indiscretions or otherwise; a very different statement from her testimony in this trial as to carrying them through the hot sun of a July day at the very period of normal reaction, and of his testimony: "I reckon that ride kind of stirred her up."

In the second place, the question of the sufficiency of evidence of contributory negligence to carry the question to the jury was not before the Court for decision upon the former appeal. The remarks of the learned Justice who wrote the opinion, therefore, are entirely *obiter,* and not binding as *res judicata.* It is inconceivable that if the testimony as to contributory negligence adduced upon this trial had been before the Court then, such a conclusion could have been reached.

Upon the former trial the defendant had a verdict, and the plaintiff was appealing. One of his grounds of appeal was that the children were presumed from their ages to have been incapable of contributory negligence, and that the negligence of their parents could not be imputed to them. That was the question up for decision, not the sufficiency of the evidence as to contributory negligence. The Court overruled the appellant's position, saying:

"The grounds stated are correct, but inapplicable. They would have been applicable in an action brought for the benefit of the infants. But where an action for the injury or death of an infant is brought for the benefit of the parents, as in this case, the contributory negligence of the parents, or their agents, is a good defense, because in reason they cannot hold defendant liable * * * for the con-

sequences of their own negligence. No one is allowed to take advantage of his own wrong."

That was a clear-cut and decisive determination of the only point at that time before the Court. The opinion then declares:

"The charge as to contributory negligence might have been omitted, because there was no evidence to sustain that defense. There was testimony that there might have been contributing causes to the death of the chilrden, but none tending to prove any such cause due to plaintiff's negligence. If the lack of evidence to sustain that defense had been brought to the attention of the Court by a motion to direct the verdict on that issue, as it should have been, the issue would have been eliminated."

Passing by the evident inadvertence of the suggestion that a verdict could have been directed upon that issue, it is clear that this observation, in the absence of a motion by the plaintiff that the issue be eliminated, was' in reference to an issue not then before the Court and must be considered *obiter*. In addition to the evidence in this trial of the careless conduct of the parents, there was also evidence not only that the inoculation should not have been made in the forenoon, but that children of these ages should not have been inoculated at all, which tends to establish negligence on the part of the family physician, the agent of the plaintiff. We do not mean to reflect upon his professional conduct, but to declare the inferences that might have been drawn from the evidence upon the issue of contributory negligence.

The principle announced, quoted above, as to contributory negligence, has strong support in the decisions of other Courts, as will be seen by reference to the notes to 18 L. R. A. (N. S.), 328, and 38 L. R. A. (N. S.), 754. Whether or not it was the purpose of the Court to overrule *Watson v. R. Co.*, 66 S. C., 47; 44 S. E., 375, which apparently states a contrary doctrine, need not be considered; for, re-

gardless of the effect of the decision upon that case, it constitutes the law of this case.

It appearing therefore that there was pertinent and substantial evidence upon the issue of contributory negligence, it was reversible error to withdraw it from the jury's consideration.

2. The second question: Was there error in admitting the report of Dr. Coward?

The reasoning and conclusion of Mr. Justice Grier upon this question are not in accord with my conclusion. I concur in the opinion of Mr. Justice Marion in the disposition of it.

3. The third question: Was there error in excluding the letter of Dr. Walter? This question need not be considered.

4. The fourth question: Was there error in not holding that the State was not liable at common law, or under the Act of 1918, for the negligence of its agents?

Independently of the matter of the State's immunity from suit, it is thoroughly established that no government or govermental subdivision is responsible in damages for the torts of its agents unless expressly made so by statute. *Hopkins v. College,* 221 U. S., 636; 31 Sup. Ct., 654; 55 L. Ed., 890; 35 L. R. A. (N. S.), 243. The State, therefore, cannot be held liable in damages for the negligence of its agents, the admitted basis of this action, unless by statute the State has not only waived its immunity from suit, but has expressly conferred upon the plaintiff the right to recover damages against it for the negligence of its agents.

It is conceded that the State, by the Act of 1918, has waived, in favor of the plaintiff, its immunity from suit; and the pivotal question is, Has it by that act conferred upon the plaintiff the right, which theretofore did not exist, to recover damages for an injury resulting from the negligence of its agents?

The title of the Act is significant:

"An Act to authorize and empower the administrator or

administrators of Thelma Sandel and Minnie Sandel to bring action against the State of South Carolina."

There is certainly nothing in the title indicative of a purpose to do aught than to waive the State's immunity from suit; which alone is expressed in the permission "to bring action."

In the body of the act the permission is given to bring action—

"for the recovery of such damages as may be proper, if any, on account of the death of the said Thelma Sandel and Minnie Sandel at Lone Star, South Carolina, in the year 1915, following the injection of serum furnished by the State of South Carolina."

There is no direct indication that the action is to be based upon the negligence of the agents of the State, or that the State intended to waive its immunity from liability on account of such negligence. Doubtless the inference is reasonable that the foundation of the suit was expected to be the negligence of the State's agents; but there is not even an inference that the State intended to waive its immunity from liability on account thereof.

It is contended by the respondent that the question is concluded by the judgment of the Court upon the former appeal. We do not so understand the opinion. If it holds that in addition to the waiver of immunity from suit, the State has also waived its immunity from liability for the torts of its agents, then clearly the Act confers upon the plaintiff a right, and imposes upon the State a liability, which did not theretofore exist; that is, a right to recover from the State damages for the torts of its agents, and a corresponding obligation on the part of the State to respond thereto. Yet we find the most unequivicoal declaration in the opinion: "The Act does not create a liability which did not exist before its passage." If that be true, and it must be conceded that the declaration is *res judicata* the law of the case, binding upon the Court upon this appeal,

the controversy is ended; the Act amounts only to a waiver of immunity from suit, leaving all other defenses open to the State.

But, it has been suggested, the opinion practically holds that independently of the Act, the State is liable for the torts of its agents; and to that extent the judgment is *res judicata.* Let us see. The Court declares:

"The State, acting through the Legislature, had the power, which it always has and should exercise on proper occasion, to recognize claims against it, founded on justice and equity. It may even recognize some moral obligations. *Graham v. State,* 109 S. C., 301; 96 S. E., 138. *The act does not create a liability which did not exist before its passage. The liability is one that is recognized by the common law.* The only obstacle that lay in plaintiff's path to the enforcement of it was the State's immunity from suit, without its consent. *The act, therefore, by giving consent, merely provides a remedy where none existed before."* (Italics added.)

The question at issue upon this phase of the case, under discussion by the Court, was the demurrer of the State to the plaintiff's complaint. The grounds of the demurrer, as gathered from the opinion, all that the Court now has access to, were that the Act of 1918 violates the three provisions of the Constitution: (1) The due process clause; (2) the requirement that every act shall relate to but one subject which shall be expressed in its title; (3) the inhibition against special legislation. 115 S. C., 181; 104 S. E., 571; 13 A. L. R., 1268. The three objections are taken up and disposed of against the contention of the State. With that conclusion the Court is now in this case absolutely bound; it is not only *res judicata,* but the law of the case. The declaration that no new liability was created by the Act was entirely proper in disposing of the constitutional objection which had been raised that the body of the Act was more extensive than the title. It is the only ground,

as we shall see, upon which the constitutionality of the Act, so far as this objection was concerned, could have been sustained. The other propositions announced are entirely foreign to the issue, are therefore *obiter,* and are so crowded with error that they cannot be followed.

It is declared: "The liability is one that is recognized by the common law." This must refer either to the liability of the State for the torts of its agents, or to the liability of the State, or of the agents of the State, to the father, for the wrongful death of his child, neither of which propositions can be sustained. As shown above, the State is the government, and it cannot be held liable for the tort of its agent without specific statutory authority therefor. It is further not only immune from liability at common law, but immune from suit. Even the agent of the State, at common law, as an individual, could not be held liable to the father for the wrongful death of his child, it required Lord Campbell's Act to create that liability. In *Edgar v. Castello,* 14 S. C., 20; 37 Am. Rep., 714, it is held:

"A father is not entitled to recover damages for the negligent killing of his infant child."

The declaration in the former opinion:

"The only obstacle that lay in plaintiff's path to the enforcement of it [liability] was the State's immunity from suit, without its consent," is far from an accurate statement of the law; and was not at all necessary to the determination of the question then before the Court, whether or not a new liability was created by the act. Two insuperable obstacles were yet in the plaintiff's path after the State's immunity from suit had been waived: (1) The nonliability of the State for the torts of its agents. (2) If ordinarily otherwise, the doctrine of *respondeat superior* will not be extended to charitable institutions.

In *Claussen v. Luverne,* 103 Minn., 491; 115 N. W., 643; 15 L. R. A. (N. S.), 698; 14 Ann. Cas., 673, it is said:

"It is elementary that neither the State nor any of the subdivisions, like a municipality, through which it operates, is liable for torts committed by public officers, save in definitely excepted classes of cases. The exemption is based upon the sovereign character of the State and its agencies, and upon the absence of obligation, and not on the ground that no means for remedy have been provided. 'The government,' said Mr. Justice Story, 'does not undertake to guarantee to any person the fidelity of the officers or agents whom it employs, since that would involve it in all its operations in endless embarrassments, difficulties, and losses, which would be subversive of the public interest.' *United States v. Kirkpatrick,* 9 Wheat., 720; 6 L. Ed., 199; *Beers v. Arkansas,* 20 How., 527; 15 L. Ed., 991."

None of the propositions advanced by the Court were necessary to the determination of the constitutional questions involved, as was the proposition that no new liability was created by the Act. We are bound by the conclusions that the Act is constitutional and that no new liability was created by it, but we are not bound by the erroneous basis of those conclusions.

In the light of the ruling upon the former appeal that the Act created no new liability, it is unnecessary really to go further; but in view of the plainly erratic grounds upon which that ruling was based, it may not be amiss to demonstrate that the ruling is sound and sustainable upon other and firm grounds.

The conclusion may have been sustained upon either of two grounds: (1) Without an express declaration of a purpose to create a new liability, of which there is none, the permission to sue will be confined to a waiver of the State's immunity from suit. (2) It was beyond the constitutional power of the Legislature to create a liability on the part of the State for an act, direct or imputed, for which it was not liable at the time of its commission; such legis-

lative action being in contravention of Article 10, § 11, and Article 17, § 2, of the Constitution.

As to the first proposition, that without an express declaration of a purpose to create a new liability, the permission to sue will be confined in its effect to a waiver of the State's immunity from suit:

In *State v. Hill*, 54 Ala., 67, the State was operating a railroad, and in that operation stock of the plaintiff was killed on the track by reason of the negligence of the engineer. The plaintiff sued under a statute which permitted a citizen to sue the State, which suit should be governed by the same rules as in suits between individuals. The Court held that when, by constitutional provision or legislative enactment, the State has permitted itself to be sued, the mere fact of permitting the suit against itself does not render the State liable for the careless or negligent acts of its servants, employees or agents, in the absence of any statute expressly fixing such liability upon the State.

In *Smith v. State*, 227 N. Y., 405; 125 N. E., 841; 13 A. L. R. 1264, the State was in possession and control of a certain reservation at Niagara Falls; the reservation was under the management of a commission. The plaintiff tripped and fell, sustaining serious injury, on account of a wire that had been negligently allowed to obstruct a path along which he was walking. He sued the State in the Court of Claims, which was authorized by statute to hear and determine private claims against the State. The statute (Code Civ. Proc., § 264) contained this provision:

"In no case shall any liability be implied against the State, and no award shall be made on any claim against the State except upon such legal evidence as would establish liability against an individual or corporation in a Court of law or equity."

The Court, after stating the general rule, well settled, that a State is not liable for injuries resulting from the negligence of its officers and agents, in the absence of a

constitutional or legislative enactment, and basing that prin-
ciple, distinct from the State's immunity from suit, on
grounds of public policy, declares:

"It is contended * * * that by consenting to be sued
the State waives its immunity from action, and nothing
more. It does not thereby concede its liability in favor of
the claimant, or create a cause of action in his favor which
did not theretofore exist. It merely gives a remedy to en-
force a liability and submits itself to the jurisdiction of
the Court, subject to its right to interpose any lawful de-
fense. *Roberts v. State,* 160 N. Y., 217; 54 N. E., 678.
Immunity from an action is one thing. Immunity from
liability for the torts of its officers and agents is another.
Immunity from such liability may be waived by some posi-
tive enactment of the Legislature. This, as I read the
section of the Code under consideration, the Legislature has
not yet done.

"Statutes in derogation of the sovereignty of the State
must be strictly construed, and a waiver of immunity from
liability must be clearly expressed. *Litchfield v. Bond, supra.*
There certainly is not in the section an express waiver of
the State's immunity from liability for the tortious acts
of its officers and agents, and the words used will not, in
my opinion, permit of such construction. * * *

"The immunity of the State from liability for the torts
of its agents is based, as I have already indicated, upon the
broad ground of public policy, and it is not waived by a
statute conferring jurisdiction only. In the absence of a
legislative enactment specifically waiving this immunity,
the State cannot be subjected to a liability therefor."

"The State is not liable in damages for the death of a
militiaman, caused by the negligence and incompetence of
one of its physicians in vaccinating him, unless liability
therefor has been voluntarily assumed by legislative act; the
State, by Code Civ. Proc., § 264, not consenting to suit
for torts of its agents while performing an act of the State

in its sovereign capacity." *McAuliffe v. State,* 107 Misc. Rep., 553; 176 N. Y. Supp., 679.

"The cases seem uniformly to hold not only that States cannot be sued without their consent, but further that even when by constitutional provision or legislative enactment the State has permitted itself to be sued, the mere fact of permitting the suit against itself does not render the State liable for the careless or negligent acts of its servants, employees or agents, in the absence of any statute expressly fixing such liability upon the State." *Davis v. State,* 30 Idaho, 137; 163 Pac., 373; Ann. Cas. 1918D, 911.

In *Stephens v. Commrs.,* 93 N. J. Law, 500; 108 Atl., 645, the Court said:

"It is urged that the express power to sue and be sued indicates an intent to subject defendant to liability in damage suits. But this same point was considered and overruled in the Strader Case." 18 N. J. Law, 108; 35 Am. Dec., 530.

In *Denning v. State,* 123 Cal., 316; 55 Pac., 1000, the action was by an employee of the harbor commissioners, agents of the State, for damages on account of personal injuries sustained by him as a result of their negligence. It was sought to maintain the action under a statute which provided:

"All persons who have, or shall hereafter have, claims on contract or for negligence against the State not allowed by the State Board of Examiners, are hereby authorized, on the terms and conditions herein contained, to bring suit thereon against the State in any of the Courts of this State of competent jurisdiction, and prosecute the same to final judgment. The rules of practice in civil cases shall apply to such suits, except as herein otherwise provided."

The Court, rejecting the contention, said:

"This statute has been considered by this Court in at least two cases, arising under different facts, and in both it was held that said statute did not create any liability or

cause of action against the State where none existed before, but merely gave an additional remedy to enforce such liability as would have existed if the statute had not been enacted."

In *Burroughs v. Commonwealth,* 224 Mass., 28; 112 N. E., 491, Ann. Cas., 1917A, 38, the Plaintiff sued for damage to his land by fire negligently set by the agents of the State, and relied upon a statute which gave the Court jurisdiction of all claims against the State, whether at law or in equity. The Court held that while the terms of the statute were "full and comprehensive, it is not to be interpreted as imposing any new obligation upon the commonwealth, or as creating a new class of claims for which a sovereignty never has been held responsible, but * * * 'to provide a convenient tribunal for the determination' " of such claims. "The statute cannot be stretched to include damages for an ordinary tort committed by an officer or employee of the commonwealth in the performance of duties prescribed by law."

In *Apfelbacher v. State,* 160 Wis., 565; 152 N. W., 144, the plaintiff sued under a special statute permitting him to sue the State for the purpose of "settling and determining all controversies which he may now have with the State of Wisconsin or its duly authorized officers and servants" relative to the operation of a certain dam, which he alleged caused damage to his property. The Court says:

"Plaintiff claims that by the enactment of this law the Legislature admitted liability on the part of the State for the Acts of its officers, and that the suit now stands just as it would stand between private parties. It is difficult to see how the Act does, or was intended to do more than remove the State's immunity from suit. It simply gives authority to commence suit for the purpose of settling plaintiff's controversies with the State. Nowhere in the Act is there a whisper or suggestion that the Court or Courts in the disposition of the suit shall depart from well-established prin-

ciples of law, or that the amount of damages is the only question to be settled. The Act opened the door of the Court to the plaintiff. It did not pass upon the question of liability, but left the suit just where it would be in the absence of the State's immunity from suit. If the Legislature had intended to change the rule that obtained in this State so long and to declare liability on the part of the State, it would not have left so important a matter to mere inference, but would have done so in express terms."

In *Riddoch v. State,* 68 Wash., 329; 123 Pac., 450; 42 L. R. A. (N. S.), 251 Ann. Cas., 1913E, 1033, the plaintiff sued for damages resulting from the fall of a balcony, under control of the State's agents, due to their negligence. He sought to maintain his action under constitutional and statutory provision of force at the time of his injury. The Constitution provided:

"The Legislature shall direct by law in what manner and in what Courts suits may be brought against the State."

Construing it the Court says:

"This provision creates no [new] cause of action, imposes no liability, as against the States, where none would exist independently of it. It merely directs the Legislature to provide a remedy for causes of action recognized at common law as against the sovereign, or created by statute."

The statute provided:

"Any person or corporation having any claim against the State of Washington shall have the right to begin an action against the State in" a certain Court.

The Court says:

"The word 'claim,' as used in this section, is synonymous with 'cause of action.' The scope of the section is the same as that of the constitutional provision. * * * It creates no cause of action. It provides a remedy for existing causes, but imposes no new liability. It does not waive any defense."

"Legislative Acts authorizing individuals to sue the State upon claims which the Legislature for any cause does not see fit to recognize and pay have been passed in many of the States. Their purpose and effect, as commonly understood, are undoubtedly nothing more than to refer to the judiciary the settlement of the questions of law and fact involved in the claims, and the determination in the form of a judgment of the rights of the parties." 25 R. C. L., 416.

In *Oakes v. United States,* 174 U. S., 778; 19 Sup. Ct., 864; 43 L. Ed., 1169, the plaintiff sued the United States for the value of a steamboat alleged to have been captured by United States forces and fitted for use by them. The suit was brought under a special Act of Congress authorizing it in the Court of claims, which was directed to determine the just rights in law of the claimant. The Court held:

"The Act neither recognizes the claim as a valid one, nor undertakes to pass upon its validity; but simply empowers the Court of Claims to hear and determine whether the claim is valid or invalid; and the determination of that issue embraces not only the questions whether the claimant was the daughter and heir at law of Worthington, whether he was a loyal citizen of the United States, whether he was the owner of three-fifths of the Eastport, and whether the vessel was taken and applied to the use of the United States, but all other questions, of law or of fact, affecting the merits of the claim."

In *United States v. Cumming,* 130 U. S., 452; 9 Sup. Ct., 583; 32 L. Ed., 1029, the plaintiff sued the United States for damages sustained in consequence of certain Acts of a collector of internal revenue. The suit was brought under a special Act of Congress, authorizing it in the Court of Claims, which was directed to pass upon the law and the facts as to the liability of the United States for the Acts of the officer, waiving the Statute of Limitations. The Court

held that there was a waiver of the defense based upon the Statute of Limitations, but not a waiver of the defense based on the general principle of the law that the United States is not liable for unauthorized wrongs inflicted on the citizen by officers while engaged in the discharge of official duties. There does not appear to be a material difference between the authority "to pass upon the law and the facts as to the liability of the United States for the Acts of its officer," as in this case, and the authority to recover "such damages as may be proper if any, on account of the death * * * following the injection of serum furnished by the State of South Carolina," as in the case at bar. The Court said:

"It is evident that Congress intended to open the doors of the Court of Claims to the plaintiffs, so far as to permit them to sue the government, unembarrassed by any defense of the Statute of Limitations, and to obtain an adjudication, based upon 'the law and facts,' as to the liability of the United States for the wrongs of which complaint is made. In other words, the jurisdiction of the Court of Claims was so enlarged as to embrace this particular demand and to authorize such judgment as, under all the evidence, would be consistent with law. Here, however, we are met with the suggestion that there is a general principle, applicable, as this Court said, in *Gibbons v. United States,* 8 Wall., 269, 275, to all governments which 'forbids, on a policy imposed by necessity, that they should hold themselves liable for unauthorized wrongs inflicted by their officers on the citizen, though occurring while engaged in the discharge of official duties.' Did Congress intend to abrogate this principle so far as the demands of the present plaintiffs are concerned? Did it invest the Court of Claims with jurisdiction to render a judgment against the United States upon its appearing that the revenue officers transcended the authority conferred upon them by law, or had exercised their authority in such manner as made them personally liable in

damages to the plaintiff? There would be some ground for an affirmative answer to these questions if the statute had not required the Court to pass upon both the law and the facts 'as to the liability of the United States.' If the facts disclosed a case of unauthorized wrongs done to the plaintiffs by the revenue officers of the United States the question, by the very terms of the Act, would still remain, whether the United States were liable, in law, for such damages as the plaintiffs had sustained. There would seem to be no escape from the conclusion that Congress intended that the liability of the government should be determined by the settled principles of law. The only right waived by the government was a defense based upon the Statute of Limitations," and of course the immunity from suit.

Answering a similar suggestion made in the case of *Graham v. State,* 109 S. C., 301; 96 S. E., 138, the Court further says:

"It is said that the Act, professedly for the relief of the plaintiffs, would be unavailing, unless it is so construed as to relieve them from the operation of the rule laid down in *Gibbons v. United States.* A satisfactory answer to this suggestion is that, if Congress intended to do more than give the plaintiffs an opportunity, in an action for damages brought in the Court of Claims, to test the question as to the liability of the United States, * * * that intention would have been expressed in language not to be misunderstood. It is as if the plaintiffs asserted before Congress the liability, in law, of the government for the damages they sustained, and Congress permitted them to invoke the jurisdiction of the Court of Claims in order that there might be a judicial determination of the question by that tribunal, with the right of appeal 'as in ordinary cases against the United States in said Court.'"

There are several material distinctions between the case at bar and the Graham Case, 109 S. C., 301; 96 S. E., 138, which very greatly weaken the controlling effect of that

case: (1) The Graham Case was one of contract, a contract formally entered into between Graham and the authorized agents of the State for the hire of certain convicts. The case at bar is one in tort. (2) The liability of the State for damages on account of the breach of contract in the Graham Case was conceded "for the recovey of such damages, if any, as he may have suffered by the abrogation of his contract;" no question of the propriety of such allowance of damages was left open. In the case at bar the action is authorized "for the recovery of such damages as may be proper, if any;" leaving the question of propriety of such allowance, as well as the amount, for the Court's adjudication. (3) It was distinctly held, in the Graham Case, that a new liability was created by the Act. "The Act was adopted upon the assumption that the contract had been rightfully terminated;" if so, and Graham had the right under the Act to maintain his action, it could only be upon the theory that that which had been lost to him was restored by the Act. In the former appeal in the case at bar the Court distinctly holds that the Act created no new liability; "the Act does not create a liability which did not exist before its passage." 115 S. C., 182; 104 S. E., 571; 13 A. L. R., 1268.

In *Murdock Co. v. Com.,* 152 Mass., 28; 24 N. E., 854; 8 L. R. A., 399, it was held that an action to recover damages for injuries resulting from the negligence of a servant of the commonwealth in the performance of his duties is not a "claim" within the meaning of a statute which authorizes the maintenance of a suit against the commonwealth to recover "all claims" against it whether at law or in equity. The Court said:

"The Act we are discussing discloses no intention to create against the State a new, and heretofore unrecognized, class of liabilities, but only an intention to provide a judicial tribunal whose well-recognized existing liabilities can be adjudicated."

In *Clodfelter v. State,* 86 N. C., 51; 41 Am. Rep., 440, it was held that a constitutional provision which confers jurisdiction upon the Court "to hear claims against the State" is confined to such claims as are legal and could be enforced if the State, like one of its citizens, were amenable to process; that it does not apply to the case of a convict who, while at work outside the prison, was injured by the negligence of State agents.

In *Billings v. State,* 27 Wash., 288; 67 Pac., 583, it was held that a State does not consent to become responsible for the misconduct or negligence of its officers or agents, by a provision of its Constitution declaring that "the Legislature shall direct by law in what manner and in what Courts suits may be brought against the State," followed by a statute providing that "any person or corporation having any claim against the State of Washington shall have the right to begin an action against the State in the Superior Court of Thurston County," although the word "claim" was held synonymous with "cause of action." The Court says:

"The State, by consenting to be sued, did not waive the right to defend, upon any legal ground, such actions as any person or corporation having a claim against it might thereafter see fit to 'begin' in the Superior Court of Thurston County. In other words, the State has retained all its legal rights as a defendant in an action, and has waived nothing but its former immunity from suits. It has not consented, either expressly or impliedly, to become responsible for the misconduct or negligence of its officers or agents; and, in the absence of a statute making it liable in damages therefor, no such action as the present one can be maintained against the State"— citing Story, Agency, § 319; *Gibbons v. United States,* 8 Wall., 274; 19 L. Ed., 453. *Clark v. State,* 7 Coldw. (Tenn.), 306. *State v. Hill,* 54 Ala., 67. *Langford v. United States,* 101 U. S., 341; 25 L. Ed., 1010.

It is noteworthy that the claim in the Billings Case arose subsequently to the passage of the Act.

In *Green v. State,* 73 Cal., 29; 11 Pac., 602; 14 Pac., 610, the plaintiffs sued under a statute expressly authorizing them to institute an action against the State for damages alleged to have been caused to their property by reason of the construction of a canal by the Levee Commissioners of the City of Sacramento. The Court held that the Act of the Legislature authorizing the bringing of the action was not an admission by the State of its liability for the alleged damages, nor a waiver of any legal defense it might have to the action, except its immunity from suit.

As to the second proposition, that it was beyond the constitutional power of the Legislature to create a liability on the part of the State for an Act, direct or imputed, for which it was not liable at the time of its commission; such legislative action being in contravention of Article 10, § 11, and Article 17, § 2, of the Constitution.

Mr. Cooley in his Principles of Constitutional Law says:

"It is not competent by legislation to bring into existence and establish against a party, a demand which previously he was neither legally nor equitably bound to recognize and satisfy."

If it should be held that the Act created a new liability, it must be held that thereby a debt was created in favor of the plaintiff against the State, unascertained in amount, it is true, but none the less a debt an obligation, to which the State must respond when the amount should be ascertained.

Article 10, § 11, of the Constitution, provides:

"To the end that the public debt of South Carolina may not hereafter be increased without the due consideration and free consent of the people of the State, the General Assembly is hereby forbidden to create any further debt or obligation, either by the loan of the credit of the State, by guaranty, indorsement or otherwise, except for the ordinary and current business of the State without first submitting the question"

—to the qualified voters at a general election; an impassable obstruction to the conclusion that a new liability was created by the Act of 1918.

Article 17, § 2, of the Constitution provides:

"The General Assembly may direct by law, in what manner claims against the State may be established and adjusted."

This plainly refers to the establishment and adjustment of valid subsisting claims against the State and not to the creation by legislative action of a new liability for an Act for which the State was not liable at the time of its commission. While Article 3, § 30, prohibiting the allowance of extra compensation after service rendered, is not applicable to the present case, it is strongly interpretative of the spirit of the Constitution against the award of a gratuity or the creation of a liability for an Act for which the State was not liable at the time of its commission.

It is held in *Chapman v. State,* 104 Cal., 690; 38 Pac., 457; 43 Am. St. Rep., 158, that under a constitutional provision forbidding the Legislature from making any gift of public money or other thing of value to any person, the Legislature has no power to create a liability against the State for any past Act of negligence upon the part of its officers or agents.

In *Clark v. State, 7* Coldw. (Tenn.), 306, it was held that a statute providing that "actions may be instituted against the State under the same rules and regulations that govern actions between private persons," merely creates a new remedy, it does not create a new liability, and does not render the State liable to an action for the negligence or torts of its officers and agents.

It has been suggested that the provisions of the Act of 1918 to the effect that the principles of law applicable to cases brought against any person or corporation shall be applicable to the actions thereby authorized indicate a pur-

pose on the part of the Legislature to waive the State's immunity from liability for the torts of its agents.

In the first place:

"Statutes permitting suits against the State must be strictly construed, being in derogation of its sovereignty." 25 R. C. L., 416.

In the second place:    It is uniformly held that the waiver of liability must not be left to inference but expressly declared.    See quotations above from *State v. Hill,* 54 Ala., 67.    *Smith v. State,* 227 N. Y., 405; 125 N. E., 841; 13 A. L.R., 1264.    *Denning v. State,* 123 Cal., 316; 55 Pac., 1000.    *United States v. Cumming,* 130 U. S., 452; 9 Sup. Ct., 583; 32 L. Ed., 1029.

5. The fifth question:    Was there error in not holding that the State, in the matter of distributing free antitoxin, occupied the position of a charitable institution, and was not on that account liable either at common law or under the Act of 1918 for the negligence of its agents?

If, as it appears beyond question, the Court now is concluded by the former decision that the Act created no new liability, a position that appears unanswerable both upon reason and authority, as well as by force of *res judicata,* nothing was waived by the State except its immunity from suit; and both defenses were open to it:    (1) That it is not responsible for the tort of its agents, and (2) that the principle of *respondeat superior* is not applicable to a sovereign, and from motives of public policy should not be extended.

"The doctrine of *respondeat superior* does not prevail against the sovereign in the necessary employment of public agents."    25 R. C. L., 407.    *Elmore v. Fields,* 153 Ala., 345; 45 South., 66; 127 Am., St. Rep., 31.    *Bourn v. Hart,* 93 Cal., 321; 28 Pac., 951; 15 L. R. A., 431; 27 Am. St. Rep., 203. · *Chapman v. State,* 104 Cal., 690; 38 Pac., 457; 43 Am. St. Rep., 158.    *Union Co. v. State,* 154 Cal., 716; 99 Pac., 183; 24 L. R. A. (N. S.), 1111.

*State v. Jahraus,* 117 La., 286; 41 South., 575; 116 Am. St. Rep., 208. *Parlor Co. v. Commonwealth,* 157 Mass., 28; 24 N. E., 854; 8 L. R. A., 399. *Claussen v. Luverne,* 103 Minn., 491; 115 N. W., 643; 15 L. R. A. (N. S.), 14 Ann. Cas., 673. *Lewis v. State,* 96 N. Y., 71; 48 Am. Rep., 607. *Clodfelter v. State,* 86 N. C., 51; 41 Am. Rep., 440. *Riddock v. State* 68 Wash., 329; 123 Pac., 450; 42 L. R. A. (N. S.), 251, Ann. Cas., 1913E, 1033.

In *Apfelbacher v. State,* 160 Wis., 565; 152 N. W., 144, it is said:

"That nonliability for torts arising out of the prosecution of governmental functions is based upon grounds of public policy distinct from the immunity of the sovereign from suit is apparent from the fact that such nonliability is invoked in favor of municipalities, subject to suit by private parties. No doubt such policy may originally have sprung, in a large measure, from the conception that the sovereign can do no wrong, but it has a more modern and tangible basis upon which to rest. The doctrine of *respondeat superior,* while an ancient one in English law, is not one that rests upon direct primary principles of justice. These principles require that the person actually committing the wrong should alone respond in damages. The doctrine rests rather upon secondary principles deduced from primary conceptions of justice. It rests upon the idea that where an enterprise is carried on for the financial benefit of a master it is considered just that he should answer for the tort of his servant in conducting it because he is deemed to profit financially by its being carried on. * * * A denial of the application of the doctrine of *respondeat superior* to the State when exercising a governmental function does not leave a person injured remediless. He has his cause of action against the person or persons actually committing the wrong. It merely refuses to extend the master's liability to cases where he does not profit by the enterprise he is engaged in,

# 64

leaving the injured party free to prosecute his suit against the person or persons who actually committed the tort."

"It is true that the rule, universally recognized and enforced that neither a State nor the United States, in the absence of statutory provision, can be made to respond in damages for the torts of its officers or agents is based on the absence of an obligation as well as on the doctrine that the sovereign is immune from suit. But the absence of obligation in such cases rests on the further principle of the common law that the doctrine of *respondeat superior* there has no application." *City of Indianapolis v. Indianapolis Water Co.,* 185 Ind., 277; 113 N. E., 369.

The immunity of a governmental agency, sovereign or subdivision, from liability for the torts of its agents is as fundamental as the immunity of a State from suit without its consent. Assuming for the sake of argument that the State in this case has waived both its immunity from suit and its immunity from liability for the torts of its agents, the question still remains whether the doctrine of *respondeat superior* shall be extended so as to embrace a tort committed by an agent of the State in carrying out the charitable purpose of the State. That the State in this particular transaction occupied the position of a charitable institution appears too plainly for discussion. The settled policy of this State as declared in two comparatively recent cases *Lindler v. Hospital,* 98 S. C., 25; 81 S. E., 512, and *Vermillion v. College,* 104 S. C., 197; 88 S. E., 649, is that the doctrine of *respondeat superior,* always within the control of the Court for reasons of public policy, will not be extended to include the liability of such institutions for the torts of its servants. No valid reason can be suggested for not including the State while engaged in similar work of charity within the benefit of that rule.

The defendant's motion for a directed verdict should have been granted.

The judgment of this Court should be that the judgment of the Circuit Court be reversed and that the case be

remanded to that Court for judgment in favor of the defendant, under rule 27 (90 S. E. xii).